EVANDER, J.
Thomas M. Angelotta, as the personal representative of the Estate of John J. Angelotta,[1] appeals from the entry of an adverse final summary judgment. He contends that the trial court erred in its determination that the leased vehicle driven by the tortfeasor, Ralph Snyder, was not covered by the automobile insurance policy issued by Security National Insurance Company (“Security”) to Snyder pursuant to Florida’s Financial Responsibility Law found in chapter 324, Florida Statutes (2007).
We find merit to Appellant’s argument and, accordingly, reverse. In doing so, we conclude that the vehicle driven by Snyder, a golf cart that had been modified, inter alia, to exceed a speed of twenty miles per hour, fell within the statutory definition of a “low speed vehicle” and, as such, was a “motor vehicle” as defined in section 324.021. Because section 324.151(l)(b) requires that an insurance policy issued pursuant to Florida’s Financial Responsibility Law “insure the person named therein against the loss from the liability imposed upon him or her by law for damages arising out of the use by the person of any motor vehicle not owned by him or her ” (emphasis added), we conclude that coverage exists in the instant case.
The facts of this case are largely undisputed. On February 28, 2008, while driving a modified golf cart on a public roadway, Snyder sideswiped a car and then crashed into a lawfully stopped golf cart operated by John Angelotta (“Angelotta”). The collision occurred within The Villages, a retirement community in which many residents utilize golf carts as a means of transportation.
Angelotta sued Snyder to recover for injuries he sustained as a result of the collision. At the time of the incident, Snyder had an automobile insurance policy with Security, issued pursuant to Florida’s Financial Responsibility Law due to Snyder’s prior conviction for driving under the influence.
Security refused to defend or indemnify Snyder in the lawsuit, claiming that the vehicle driven by Snyder was not covered under its insurance policy. Angelotta ultimately obtained a final judgment against Snyder in the amount of $70,515.29. Snyder then assigned to Angelotta his rights to any monies from any and all actions he may have against Security relating to the events giving rise to Angelotta’s lawsuit against Snyder, in exchange for Angelot-ta’s promise not to execute upon the final judgment.
Angelotta then filed an action against Security, seeking a declaratory judgment that the modified golf cart was covered by Snyder’s insurance policy and raising breach of contract and bad faith claims. The bad faith claim was abated.
Both parties subsequently filed competing motions for summary judgment. At the summary judgment hearing, the parties agreed that there were no genuine issues of material fact and that the legal issue to be determined was whether the damages caused by Snyder, while operating the leased modified golf cart, were covered by the insurance policy.
*1216 Security argued that pursuant to the terms of the insurance policy, it was only obligated to cover bodily injury or property damage for which the insured was legally responsible if the injury or damage was caused by a sudden, unexpected and unintended event that arose out of the ownership, maintenance, or use of an “auto.” “Auto” was defined by the policy as
any self-propelled private passenger motor vehicle with not less than four wheels designed principally for use on paved public streets and, highways, provided it has a gross vehicle weight (as determined by the manufacturer’s specification) of 12,000 pounds or less and is not a step-van, parcel delivery van, cargo cutaway van or other van with cab separate from the cargo area.
(Emphasis added). It was Security’s position that the modified golf cart in question was not “designed principally for use on paved public streets and highways.”
Security further argued that it was not required to defend or indemnify Snyder based on the policy’s “regular use” exclusion:
[There is no] liability coverage for the ownership, maintenance, or use of:
Any vehicle, other than “your covered auto” which is:
(a) Owned by “you”; or
(b) Furnished or available for “your” use; or for which you are a “frequent operator.”
The undisputed facts in the instant case reflect that the modified golf cart leased by Snyder was available for his regular use and was not listed on the policy as a covered vehicle.
In response, Angelotta argued that the modified golf cart was, in fact, a “low-speed vehicle” under Florida law and, as such, was a “motor vehicle” under Florida’s Financial Responsibility Law. Ange-lotta further contended that to the extent the policy’s “regular use” exclusion and/or its definition of “auto” conflicted with Florida’s Financial Responsibility Law, those provisions were invalid.
The trial court determined, as a matter of law, that Snyder’s vehicle was a golf cart and as such, was not covered by Security’s policy because it was not “designed principally for use on paved public streets and highways.” Based on this determination, the trial court granted Security’s motion for summary final judgment and denied Angelotta’s competing motion for partial summary judgment. We respectfully disagree with the trial court’s analysis.
Angelotta argues that the modifications made to the vehicle in question brought the vehicle within the statutory definition of a “low-speed vehicle.” We agree. Section 320.01(22), Florida Statutes (as amended effective Jan. 1, 2008) defines a “golf cart” as “a motor vehicle that is designed and maintained for operation on a golf course for sporting or recreational purposes and that is not capable of exceeding speeds of 20 miles per hour.” (emphasis added). By contrast, a “low-speed vehicle” is defined as “any four-wheeled electric vehicle whose top speed is greater than 20 miles per hour but not greater than 25 miles per hour, including neighborhood electric vehicles. Low-speed vehicles must comply with the safety standards in 49 C.F.R. s. 571.500 and s. 316.2122.” § 320.01(42), Fla. Stat.
Here, the undisputed facts establish that the vehicle driven by Snyder was capable of exceeding speeds of twenty miles per hour and fell squarely within Florida’s *1217 statutory definition of low-speed vehicle.[2]
The fact that a vehicle fits within the definition of a low-speed vehicle rather than a golf cart is legally significant in several respects:
(1) Low-speed vehicles are required to be registered and insured if they are being operated on a roadway. See § 316.2122(3), Fla. Stat. (2007). By contrast, golf carts are generally exempt from Florida’s vehicle registration requirements. See § 320.105, Fla. Stat. (2007).
(2) A low-speed vehicle driven on any public roadway must be operated by an individual with a valid driver’s license. See § 316.2122(4), Fla. Stat. There is no similar requirement for the operator of a golf cart. See § 316.212(6), Fla. Stat. (2007) (“A golf cart may not be operated on public roads or streets by any person under the age of 14.”).
(3) Unlike golf carts, low-speed vehicles are required to comply with the safety standards set forth in section 316.2122, Florida Statutes[3] and section 571.500 of the Code of Federal Regulations.[4]
(4) In the absence of a local ordinance, a low-speed vehicle may be operated on streets with a posted speed limit of thirty-five miles per hour or less. See § 316.2122(1), Fla. Stat. By contrast, in the absence of a local ordinance, the operation of a golf cart on public roadways is extremely limited. See § 316.212, Fla. Stat.
For purposes of Florida’s Financial Responsibility Law, a “motor vehicle” is defined as “every self-propelled vehicle which is designed and required to be licensed for use upon a highway_” § 324.021(1), Fla. Stat. (2007). The modified golf cart/ low-speed vehicle driven by Snyder at the *1218 time of the February 28, 2008 collision falls within the Financial Responsibility Law’s definition of “motor vehicle.” It was designed for use on Florida’s highways[5] and was required by federal and state law to have numerous items of safety equipment to help insure its safe operation on public roads. Furthermore, it was required to be registered in accordance with section 320.02, Florida Statutes (2007). Section 320.02(1) provides: “Except as otherwise provided in this chapter, every owner or person in charge of a motor vehicle which is operated or driven on the roads of this state shall register the vehicle in this state.” (emphasis added).
An insurance policy issued as proof of financial responsibility pursuant to chapter 324 is required to insure the policyholder not only for liability for damages arising out of the ownership or use of the policyholder’s covered vehiele(s), but also against loss from liability imposed by law for damages arising out of the use by the person of any motor vehicle not owned by the policyholder:
An operator’s motor vehicle liability policy of insurance shall insure the person named therein against loss from the liability imposed upon him or her by law for damages arising out of the use by the person of any motor vehicle not owned by him or her....
§ 324.151(l)(b), Fla. Stat. (2007).
Based on the clear and unambiguous language of section 324.151, Security was required to insure Snyder against loss from liability imposed upon him for damages suffered by Angelotta as a result of Snyder’s negligent operation of his leased vehicle on February 28, 2008.
To the extent that the “regular use” exclusion and the definition of “auto” in Security’s policy conflicted with Florida’s Financial Responsibility Law, those provisions are invalid. A policy procured under the Financial Responsibility Law is an insurance policy for the benefit of the public using the highways of this state. Therefore, it may not contain exclusions which destroy the effectiveness of the policy as to any substantial segment of that public. See Allstate Indem. Co. v. Wise, 818 So.2d 524, 527 (Fla. 2d DCA 2001) (“Intentional act” exclusion set forth in policy issued pursuant to chapter 324 was unenforceable because to hold otherwise would “contravene the public policy behind the financial responsibility laws.”); Makris v. State Farm Mut. Auto. Ins. Co., 267 So.2d 105, 108-109 (Fla. 3d DCA 1972) (employee exclusion in automobile insurance policy issued pursuant to chapter 324 was unenforceable as matter of law).
We reverse the trial court’s entry of summary final judgment in favor of Security and direct that, on remand, the trial court grant the motion for partial summary judgment filed by the plaintiff below.
REVERSED and REMANDED.
LAWSON and COHEN, JJ., concur.

. John Angelotta died during the pendency of this appeal. Pursuant to Florida Rule of Appellate Procedure 9.360(c)(3), this court granted the motion of Thomas M. Angelotta, as personal representative, to be substituted as the appellant in this action.

. The National Highway Traffic Safety Administration similarly defines a low-speed vehicle as a four-wheeled motor vehicle whose attainable speed is more than twenty miles per hour, but not greater than twenty-five miles per hour on a paved level surface. See 49 C.F.R. § 571.3 (2008). In its commentary to this rule, the National Highway Traffic Safety Administration opined:
Speed-modified golf cars are motor vehicles. Not only are speed-modified golf cars whose top speed is between 20 and 25 miles per hour fast enough to be capable of being used on roads with low-posted speed limits, but also their operation on public roads is commonplace_Further, much of the on-road use is not incidental to the playing of golf. Instead, many trips are made for purposes unrelated to golf, such as shopping or visiting friends.
63 F.R. 33194, 33205.

. Section 316.2122(2) provides that a low-speed vehicle must be equipped with "headlamps, stop lamps, turn signal lamps, tail-lamps, reflex reflectors, parking brakes, rearview mirrors, windshields, seat belts, and vehicle identification numbers.”

.Section 49 C.F.R. 571.500, S5.(b) provides that each low-speed vehicle shall be equipped with:
(1) Headlamps,
(2) Front and rear turn signal lamps,
(3) Taillamps,
(4) Stop lamps,
(5) Reflex reflectors: one red on each side as far to the rear as practicable, and one red on the rear,
(6) An exterior mirror mounted the on the driver’s side of the vehicle and either an exterior mirror mounted on the passenger’s side of the vehicle or an interior mirror,
(7) A parking brake,
(8) A windshield that conforms to the Federal motor vehicle safety standard on glazing materials (49 CFR 571.205),
(9) A VIN that conforms to the requirements of part 565 Vehicle Identification Number of this chapter, and
(10) A Type 1 or Type 2 seat belt assembly conforming to Sec. 571.209 of this part, Federal Motor Vehicle Safety Standard No. 209, Seat belt assemblies, installed at each designated seating position.

. Although Florida’s Financial Responsibility Law does not provide a definition for a “highway,” that term is defined by Florida's motor vehicle traffic laws to include:
The entire width between the boundary lines of every way or place of whatever nature when any part thereof is open to the use of the public for purposes of vehicular traffic.
§ 316.003(53)(a), Fla. Stat. (2007); see also § 322.01(38), Fla. Stat. (2007); Mattingly v. State, 41 So.3d 1020, 1021-22 (Fla. 5th DCA 2010).